**ENVIRONMENTAL TECTONICS**

v.

**W.S. KIRKPATRICK, INC., Development International Corporation, Dic (Holding) Inc., IDC International S.A. Luxembourg, Harry G. Carpenter c/o W.S. Kirkpatrick, Inc. and Benson "Tunde" Akindele John M. Krankel, Emro Engineering Co., Inc. Robert W. Ruppert c/o Emro Engineering Co., Inc., Ross E. Saxon c/o Nautilus Environmental Systems, Inc. & R.H. Edwards.**

**Appeal of ENVIRONMENTAL TECTONICS CORPORATION INTERNATIONAL.**

**Appeal of W.S. KIRKPATRICK & CO., INC., W.S. Kirkpatrick & Co., International and D.I.C. (Holding) Inc.**

**Nos. 87–5328, 87–5546.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 20, 1987.

Decided May 2, 1988.

As Amended May 9, 1988.

Thomas H. Sear (argued), Rhonda D. Orin, Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, for appellees-cross-appellants, W.S. Kirkpatrick & Co., Inc., et al.

Thomas B. Rutter (argued), Rutter, Turner & Stein, Philadelphia, Pa., for appellant-cross-appellee, Environmental Tectonics Intern., Inc.

Theodore V. Wells, Jr., Robert L. Krakower (argued), Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for appellee-cross-appellant, Harry G. Carpenter.

Before GREENBERG and SCIRICA, Circuit Judges and POLLAK, District Judge.*

## OPINION OF THE COURT

LOUIS H. POLLAK, District Judge:

Appellant Environmental Tectonics Corporation International ("ETC"), a Pennsylvania corporation, brought this action to recover damages against several defendants for, *inter alia,* violations of the federal Racketeering Influenced Corrupt Organizations Acts, 18 U.S.C. §§ 1962–1968, the New Jersey Anti–Racketeering Act, 2C N.J.C.S. § 41–1 et seq., and the Robinson–Patman Act, 15 U.S.C. § 13(c). Essentially, ETC claims to have been injured by an apparently successful scheme, allegedly participated in by all of the defendants, to influence the award of a Nigerian defense contract through bribery of Nigerian government officials. The district court concluded that the act of state doctrine barred adjudication of ETC's claims, and dismissed the action in its entirety. In the

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

alternative, the court also ruled on other substantive and procedural issues.

## I.

This action arose from the award of a contract by the Federal Republic of Nigeria to defendants W.S. Kirkpatrick & Co. ("Kirkpatrick") and W.S. Kirkpatrick & Co. International ("Kirkpatrick International"), both of which are New Jersey corporations. Kirkpatrick is in the business of selling and brokering aircraft equipment, parts and facilities to airlines and foreign air forces. Kirkpatrick International, its wholly-owned subsidiary, was formed to carry out Kirkpatrick's duties under the contract to be awarded by the Nigerian government. Also named as defendants were Kirkpatrick's parent corporations, DIC (Holding) Inc. ("DIC"), a Delaware Corporation, and International Development Corporation, S.A. ("IDC"), a Luxembourg corporation.

In 1980, when the events alleged in the amended complaint[1] began, defendant Harry Carpenter was chairman of Kirkpatrick's board of directors and the company's chief executive officer. In 1980, Carpenter learned that the Nigerian government was interested in purchasing aeromedical equipment, and in constructing and equipping an aeromedical center for the Nigerian Air Force at Kaduna Air Force Base (the "Air Force contract"). Kirkpatrick contracted with defendants Emro Engineering Co., Inc. ("EMRO") and Nautilus Environmedical Systems, Inc. ("Nautilus") to provide engineering, design and related assistance needed to build the proposed facility and to supply the equipment.

Carpenter hired a Nigerian national, defendant Benson ("Tunde") Akindele, to act as Kirkpatrick's local agent in all matters pertaining to the Air Force contract. In or around March of 1981, Carpenter and Nautilus president Ross Saxon[2] met with Akindele to discuss their bid strategy. According to a contemporaneous memorandum written by Carpenter, Akindele told Carpenter and Saxon that to secure the bid Kirkpatrick should be prepared to pay a sales commission totalling twenty percent (20%) of the contract price. Most of this commission was to be paid to Nigerian political and military officials.[3] Akindele explained that Nigerian officials generally expected such payments from contract bidders, and that American companies often lost Nigerian defense contracts to their European competitors because they failed to make such arrangements.

Through a written agreement with Akindele, Kirkpatrick agreed to pay the commissions to two Panamanian corporations. In May of 1981, these corporations—which were controlled by Akindele—were established to receive the commissions and to distribute them to Nigerian officials. On March 19, 1982, the Nigerian Defense Ministry entered into an agreement awarding the Air Force contract to Kirkpatrick International. In September of 1982, the Nigerian government made the first of four contract payments to Kirkpatrick. The remaining payments were made in December of 1982, in February of 1983, and in August of 1983. After each of the four contract payments, the defendants via the United States mails and wire transfers paid a portion of the promised commissions to Akindele's Panamanian corporations, whence the monies were distributed to Nigerian officials. In the end, Kirkpatrick's commission payments to the Panamanian corporations, and thus, to Akindele and various Nigerian officials, totalled over $1.7 million.

In the latter half of 1981 and 1982, while Kirkpatrick was implementing the bid strategy described above, ETC, which is also in the business of selling aeromedical

---

**1.** The following factual recital is based primarily on the amended complaint.

**2.** Saxon and Robert Ruppert, Emro's president, were also named as defendants. Two other Kirkpatrick officers, Robert H. Edwards and John M. Krankel, were named as well.

**3.** ETC alleged in its complaint that the 20% commission was to be distributed as follows: 2½% for Akindele, 5% for the Nigerian Air Force, 2½% for the medical group, 5% for a political party, 2½% for the relevant cabinet minister, and 2½% for other key defense personnel.

equipment to foreign governments, was preparing its own bid for the Air Force project. ETC submitted its pricing information to the Nigerian government in February of 1981, and it continued in contact with Nigerian military and diplomatic officials throughout the course of that year. ETC's president met with Nigerian officials in Nigeria, and submitted a formal bid for the Air Force contract in December of 1981. ETC submitted its final formal bid in February of 1982, a month before the Nigerian government awarded the contract to Kirkpatrick.

ETC states that it decided to investigate the Nigerian government's award of the Kaduna contract to Kirkpatrick in April of 1983, after learning that its bid had been far lower than Kirkpatrick's. ETC reported its findings to the Nigerian Air Force [4] and to the United States Embassy in Lagos, Nigeria. After an investigation by the United States Justice Department, Carpenter and Kirkpatrick each were charged with violating the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2 (hereinafter "FCPA").

As part of their plea negotiations on the United States charges, Kirkpatrick and Carpenter both agreed to offers of proof which outlined the Air Force contract scheme in its entirety, including Carpenter's hiring of Akindele, and Akindele's control of the Panamanian corporations.

Both offers of proof also stated that Akindele and Carpenter agreed that the money paid to the Panamanian corporations as commissions would be distributed to Nigerian political and military officials. Carpenter and Kirkpatrick both pleaded guilty to one FCPA violation, and were eventually sentenced: Carpenter to two hundred hours of community service and a fine of $10,000, and Kirkpatrick to a fine of $75,-000, payable over a five-year period.[5]

ETC filed this action shortly after Kirkpatrick's sentencing. Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which contended, *inter alia*, that the plaintiff had failed to allege a "pattern of racketeering activity" as required by the federal and state racketeering statutes. ETC filed an amended complaint that responded to some of the issues raised by the defendants' motion to dismiss, and that added common law counts to ETC's antitrust, RICO, and anti-racketeering counts. ETC also filed an answer to the remainder of the defendants' motion to dismiss.

In their reply to ETC's answer to their motion, defendants moved for dismissal of the action in its entirety on act of state grounds. The district court requested further submissions from the parties in the form of answers to specific questions. The court also requested a *Bernstein* letter,

---

4. Both bribery and the acceptance of a bribe by a government official are illegal under Nigerian law. *See* Decree No. 38 (November 22, 1975) in Federal Republic of Nigeria Official Gazette Extraordinary, No. 59, December 2, 1975.

5. At Kirkpatrick's sentencing on January 6, 1986, Assistant United States Attorney Steven Levy, who was in charge of Carpenter's and Kirkpatrick's prosecutions, made the following representation to the court:

Your Honor, I guess I would also like to say that the political impact of this case, of this case cannot be underestimated [sic].... I can say that the government of Nigeria as well as the State Department [of the United States] have shown a vital interest in this case. In fact, the State Department has been very concerned about the possible political impact upon the government of Nigeria if the Grand Jury disclosed certain information about who possibly received the payments which are set forth in the memorandum that Mr. Carpenter

wrote to other senior officers of the corporation.

I have as attorney for the Government [of the United States], your Honor, been resisting attempts by the Nigerian government to find out this information because I have not had a disclosure order and the State [D]epartment has its concerns about what would happen if the government of Nigeria actually knew who was involved in this scheme to sort of rip off money from this Nigerian contract.

This is not a case where there is not a victim. Shagari, who was the president of Nigeria at the time of this contract[,] is now under house arrest. Some of these other individuals[,] and I can name them if the Court is interested, are very prominent military figures who are still in power in Nigeria. The Nigerian government would certainly like to have their names,....

Transcript of Sentencing of Kirkpatrick, dated January 6, 1986, p. 9, l. 21 to p. 10, l. 22.

i.e., an opinion from the State Department on whether the act of state doctrine should be applied in the circumstances presented by this case.[6] Legal Adviser Abraham Sofaer responded to the court's request in a letter dated December 10, 1986, which is appended to this opinion. Treating defendants' motion to dismiss as a motion for summary judgment, the district court dismissed the action on act of state grounds. *See Environmental Tectonics Corp., International v. W.S. Kirkpatrick & Co., Inc.*, 659 F.Supp. 1381, 1391–98 (D.N.J. 1987).

Although the dismissal on act of state grounds embraced ETC's entire claim against all the defendants, the district court went on to rule, in the alternative, on other issues: The court rejected defendants' contention that ETC lacked standing to assert antitrust and RICO claims. The court did, however, dismiss the RICO count for failure to allege a pattern of racketeering activity. For the same reason, the court dismissed the New Jersey Anti–Racketeering count. In addition, the court upheld a magistrate's determination that Carpenter was entitled to decline to answer, on Fifth Amendment grounds, certain questions put to him on deposition. Finally, the court held that ETC's amended complaint adequately stated a case for holding IDC and DIC legally responsible for Kirkpatrick's scheme to obtain the Air Force contract.

ETC appeals from the act of state, racketeering, and Fifth Amendment rulings. The defendants, in addition to urging the correctness of these rulings, have cross-appealed from those alternative rulings that were adverse to them. Since the district court's grant of summary judgment on act of state grounds, if affirmed here, would obviate consideration of all other issues, we turn first to the act of state question.

## II.

On review of a district court's grant of summary judgment, we utilize the same standard that the district court was required to apply. *See Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3rd Cir. 1987). There is no real disagreement on the facts relevant to the district court's act of state determination. On this appeal, therefore, we are called upon to decide whether the appellees were entitled to judgment as a matter of law. *See* Fed.R. Civ.P. 56(c).

 ETC's challenge to the district court's grant of summary judgment raises important issues about the proper application of the act of state doctrine. The doctrine is the judiciary's institutional response to the foreign relations tensions that can be generated when a United States court appears to sit in judgment on a foreign state's regulation of its internal affairs. Under the doctrine, the courts of this country will refrain from judging the validity of a foreign state's governmental

---

**6.** The term *"Bernstein"* letter" is derived from the Second Circuit's opinion in *Bernstein v. N.V. Nederlandsche–Amerikaansche Stoomvaart–Maatschappij*, 210 F.2d 375 (2nd Cir.1954). Plaintiff Bernstein, a German national, owned a corporation that was confiscated by the Nazi government during World War II. The corporation's main asset was a ship; Bernstein was forced to relinquish title to the ship, as well as all other interest in the corporation. The Second Circuit initially dismissed Bernstein's suit against the ship's subsequent owners on act of state grounds. *See Bernstein v. Van Heyghen Freres Societe Anonyme*, 163 F.2d 246 (2nd Cir. 1947). The court reversed itself after receiving a letter from the State Department's Legal Adviser, which stated that it was United States policy to permit the courts to exercise jurisdiction over claims to recover property expropriated by Nazi officials.

The Supreme Court subsequently determined that, while it was proper for a federal court to consider a *Bernstein* letter, the Legal Adviser's recommendation in any given case was not to be considered binding on the court. In *First National Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), Justice Rehnquist, announcing the judgment of the court, argued that the federal courts should defer to the view of the State Department; but only two other members of the court, Chief Justice Burger and Justice White, joined in his opinion. Justices Douglas and Powell, each of whom concurred separately, rejected the view that the State Department's view should control. So, too, did Justice Brennan, joined by Justices Stewart, Marshall, and Blackmun in dissent.

acts in regard to matters within that country's borders. *See Restatement (Revised) of Foreign Relations Law of the United States* § 469[428] (1986). The party moving for the doctrine's application has the burden of proving that dismissal is an appropriate response to the circumstances presented in the case. *See Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 694, 96 S.Ct. 1854, 1861, 48 L.Ed.2d 301 (1976); *Williams v. Curtiss-Wright*, 694 F.2d 300, 303 n. 4 (3rd Cir.1982).

■ Although earlier formulations of the doctrine were grounded in notions of comity among sister states,[7] the core concern of modern act of state jurisprudence is preserving the separation of powers between the federal judiciary and the political branches of our government—especially, the executive branch, where primary responsibility for the conduct of foreign affairs is lodged. As explained by the Supreme Court in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Id.* at 423, 84 S.Ct. at 938. Thus, courts are required to decline to exercise jurisdiction over cases that may embarrass or impede the political branches of government in their conduct of foreign affairs. *See First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765–68, 92 S.Ct. 1808, 1812–14, 32 L.Ed.2d 466 (1972) (hereinafter *"Citibank"*).

Sensitively applied, the doctrine can prevent judicial entanglement in international conflicts that are more appropriately resolved through political channels. Individual litigants and the enforcement of national policies pay a price, however, for this institutional self-discipline—its application in effect means that "on occasion individual litigants may have to forgo decisions on the merits of their claims because the involve-ment of the courts in such a decision might frustrate the conduct of the Nation's foreign policy." *Citibank*, 406 U.S. at 769, 92 S.Ct. at 1814 (opinion of Rehnquist, J.). For this reason, the Supreme Court has not laid down rigid rules to govern the doctrine's application, but leaves it to the lower courts to determine whether a conflict between the judicial and political branches exists in a particular case. *See id.* at 775–76, 92 S.Ct. at 1817 (Powell, J. concurring); *Mannington Mills v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3rd Cir.1979) (courts should analyze the nature of the questioned conduct and the effect upon the parties in addition to appraising the sovereign's role).

The main issue raised by ETC's appeal involves the proper application of the doctrine when a litigant invokes the doctrine as a defense to a suit for damage or injury stemming from a course of events that included some acts by officials of a foreign government. *Sabbatino* and the Supreme Court's other modern act of state cases have focused on state expropriations of private property, the clearest example of a political act that, to paraphrase Justice Harlan, touches on the nerves of the international community. *See Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940. This has, however, left a broad range of governmental conduct—*e.g.*, court decisions; the granting of a license, patent, or some other state monopoly; or, as in this case, the award of a construction or procurement contract—for lower courts to consider.

■ The appellant has advanced several objections to the district court's act of state determination. Two of these objections lack merit. First, we agree with the district court's conclusion that the award of a military procurement contract can be, in certain circumstances, a sufficiently formal expression of a government's public interests to trigger application of the doctrine. It is true that certain governmentally authorized acts, such as the award of a patent or the acts of a bankruptcy trustee, are considered so routine as to be not of sub-

---

7. *See Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed.2d 456 (1898); *Restate-ment (Revised) of U.S. Foreign Relations Law* § 469 [428] comment a.

stantial concern to the political branches in their conduct of foreign policy. *See Remington Rand Corp. v. Business Systems, Inc.,* 830 F.2d 1260, 1265 (3rd Cir.1987); *Mannington Mills,* 595 F.2d at 1294. But the award of a major defense contract generally does not result from a near-mechanical exercise of narrowly-defined governmental discretion. The award of a military contract, particularly one for a major project, is usually influenced by national security considerations—considerations that are far from routine.

 We also agree with the district court that the so-called "commercial" exception to the act of state doctrine—an exception endorsed by a plurality of the Supreme Court but neither acquiesced in nor rejected by a majority, *see Alfred Dunhill of London v. Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976)—has no application to this case.[8] Under the commercial exception's terms, a court would not abstain from deciding a case involving the purely commercial act of a sovereign or one of its instrumentalities. *See Dunhill,* 425 U.S. at 695, 96 S.Ct. at 1861–62 (plurality opinion of White, J.). To determine whether an act is purely commercial in character, a court looks not to the purpose of the act but to its nature, i.e., whether the activity is of the type that an individual would carry on for profit. *Cf. Letelier v. Republic of Chile,* 748 F.2d 790, 797 (2nd Cir.1984) (applying the Foreign Sovereign Immunity Act's definition of "commercial"), *cert. denied* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *Texas Trading v. Federal Republic of Nigeria,* 647 F.2d 300, 310 (2nd Cir.1981) (same), *cert. denied* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). While the act of contracting will in many circumstances be properly characterized as commercial conduct, the decision to award a defense contract to one bidder or another is by its very nature governmental. *See Curtiss–Wright,* 694 F.2d at 302.

We part company with the district court, however, on the remainder of its act of state analysis. The district court employed a formulation of the doctrine that barred the adjudication of ETC's claims "if the inquiry presented for judicial determination includes the motivation of a sovereign act which would result in embarrassment to the sovereign or constitute interference in the conduct of the foreign policy of the United States." *ETC,* 659 F.Supp. at 1392–93. The court found that adjudication of ETC's claims would lead inevitably to an examination of the Nigerian government's motives in awarding the Nigerian contract to Kirkpatrick. Because the district court was convinced that such a finding would be interpreted as criticism of the Nigerian Government, it concluded that this case presents the type of situation which precludes judicial inquiry. *See id.* at 1393.

In reaching its conclusion, the district court relied primarily on the interpretation of the act of state doctrine advanced in a Ninth Circuit case, *Clayco Petroleum v. Occidental Petroleum,* 712 F.2d 404 (9th Cir.1983), *cert. denied* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). In *Clayco,* the plaintiff and the defendant, Occidental Petroleum, were in competition for an off-shore oil concession offered by Um Al Quywayn. Clayco alleged that it was first offered the concession, but that Um Al Quywayn's oil minister awarded Occidental the contract after Occidental paid the minister and his son over $400,000 in bribes. After the media discovered and reported the bribery scheme, the SEC brought an action against Occidental that charged violations of the Securities Exchange Act of 1934, based on the allegedly illegal payments. Occidental agreed to a permanent injunction, and to an internal review of its bidding practices. Clayco brought suit after the report prepared pursuant to that review revealed that illegal payments had in fact been made. *See Clayco,* 712 F.2d at 405–06. The district court dismissed *Clayco's* lawsuit on act of state grounds.

---

**8.** In *Curtiss–Wright,* 694 F.2d at 302 n. 2, this court noted that the commercial exception has not been endorsed by a majority of the Supreme Court. We have no occasion here for going beyond what was said in *Curtiss–Wright.*

In a *per curiam* opinion, the Ninth Circuit affirmed the dismissal, concluding that the act of state doctrine barred adjudication of Clayco's claims. Although calling for a "flexible" approach to the doctrine's application, the court expressed its unwillingness to permit judicial inquiry into the motivation behind Um Al Quywayn's award of the concession. Since a determination that bribery had in fact occurred would "impugn or question the nobility of a foreign nation's motivation," and since "the very existence of plaintiffs' claim depends upon establishing that the motivation for the sovereign act was bribery," the court concluded that the executive's conduct of foreign affairs was sure to be embarrassed by such a proceeding. *See Clayco,* 712 F.2d at 407.

*Clayco's* expansive application of the act of state doctrine seems at variance with the principle which has guided this court, that the doctrine "is not lightly to be imposed...."[9] *Mannington Mills,* 595 F.2d at 1293. In *Mannington Mills,* the plaintiff claimed that defendant Congoleum violated the antitrust laws by using patents it allegedly procured by fraud to restrict the plaintiff's trade abroad. In bringing its suit, plaintiff did not ask the court to declare the foreign patents invalid. Instead, Mannington argued that its action was concerned only with proving Congoleum's violations of United States trade regulations. *See Mannington Mills,* 595 F.2d at 1290–91.

In *Mannington Mills* this court held, through Judge Weis, that the act of state doctrine did not bar adjudication of the plaintiff's claims. The court focused on the nature of the questioned conduct—the grant of a patent, an essentially routine act that raised no serious foreign policy concerns. *See id.* at 1294. But implicit in the opinion was an unwillingness to allow litigants to shield themselves from the consequences of illegal conduct abroad by invoking the act of state doctrine as a defense in American courts. *See id.* at 1293.

What was implicit in *Mannington Mills* became explicit in *Williams v. Curtiss-Wright.* Plaintiff Williams alleged that defendant Curtiss-Wright monopolized the international market for a certain kind of jet engine, and claimed violations of the federal antitrust laws, as well as injury caused by common-law torts. Curtiss-Wright moved to dismiss Williams' complaint on act of state grounds, arguing that the doctrine precluded the examination of foreign governments' motives in refusing to buy engine parts from the plaintiff. The district court denied Curtiss-Wright's motion. *See Curtiss-Wright,* 694 F.2d at 301–02.

On appeal, this court, again speaking through Judge Weis, affirmed. This court rejected an approach to the doctrine that would in all circumstances foreclose judicial scrutiny of the motivations behind the military procurement decisions of a foreign government. Judge Weis noted that a private litigant is not necessarily immune from antitrust liability simply because the illegal scheme involves some acts by an agent of a foreign government. *See id.* at 304 (citing *Continental Ore v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). The opinion stressed the importance of insuring that the act of state doctrine not interfere with the implementation of the policies served by antitrust and other regulatory statutes. "The act of state doctrine should not be applied to thwart legitimate American regulatory goals in the absence of a

---

**9.** One commentator has noted that *Clayco* has adopted the "strict" view of the act of state doctrine favored by other courts, most notably the Second Circuit in *Hunt v. Mobil Oil,* 550 F.2d 68 (2nd Cir.), *cert. denied* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), that precludes examination of a foreign sovereign's motivations. *See* Bazyler, *Abolishing the Act of State Doctrine,* 134 U.Pa.L.Rev. 325, 357 n. 190 (1986). Courts and commentators alike have criticized this interpretation of the doctrine as discouraging effective enforcement of United States regulatory policies against those who violate the law by engaging in illegal or anticompetitive conduct abroad. *See, e.g., Industrial Investment Development Corp. v. Mitsui & Co., Ltd.,* 594 F.2d 48, 55 (5th Cir.1979), *cert. denied* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980); *Sage International, Ltd. v. Cadillac Gage Co.,* 534 F.Supp. 896 (E.D.Mich.1981); *Bazyler, supra,* at 347. This court has expressed similar concerns with too sweeping an application of the doctrine. *See Curtiss-Wright,* 694 F.2d at 304 & n. 5.

showing that adjudication may hinder international relations...." *See id.* at 304 (citations omitted). Having found that the record did not show that litigation of Williams' claims would impede the executive's conduct of foreign relations, this court held that application of the doctrine was not called for.

The formulation of the act of state doctrine outlined in *Mannington Mills* and *Curtiss-Wright* does not allow a court to invoke the doctrine on the basis of mere conjecture about the effect that the disclosure of certain facts might have on the sensibilities of foreign governments. Instead, these cases require that a defendant come forward with proof that adjudication of a plaintiff's claim poses a demonstrable, not a speculative, threat to the conduct of foreign relations by the political branches of the United States government.

In the instant case, the district court's dismissal was based on little more than speculation about the effect that ETC's lawsuit might have on relations between the United States and Nigeria. The traditional justification for involving the doctrine, i.e., avoiding a judicial determination of the legal validity of a state's act within its own borders, is not present in this case. Appellant does not seek to have the Air Force contract invalidated, nor does it seek compensation for its alleged losses from the Nigerian government. No Nigerian official is named as a defendant in the complaint.

Thus, to resolve ETC's claims on their merits, the district court would be called on simply to determine as a factual matter whether the appellees' alleged bribery of Nigerian officials motivated the award of the contract. The only information before the court authoritatively measuring the impact such a determination might have on the executive's conduct of foreign policy was the letter from Legal Adviser Sofaer.[10] That official pronouncement of State Department policy, as it relates to this litigation, reads in pertinent part, as follows:

In recent years, the United States Executive Branch has addressed the question of whether the act of state doctrine requires dismissal of proceedings that may call for judicial inquiry into the *motivations* (as opposed to the legal validity) of the public acts of foreign states. Specifically, as the United States stated in an *amicus curiae* brief before the United States Supreme Court:

[W]hile judicial examination of purpose may on occasion implicate some of the concerns underlying the act of state doctrine, that doctrine only precludes judicial questioning of the *validity* or *legality* of foreign government actions....

None of this Court's decisions suggest that the act of state doctrine precludes all judicial inquiries that may embarrass a foreign state or affect the political branches' conduct of foreign relations. Rather, the act of state doctrine is based on the need to avoid unprincipled decisions resulting from the absence of legal standards, and the unique embarrassment, and the particular interference with the conduct of foreign affairs, that may result from the judicial determination that a foreign sovereign's acts are invalid. Judicial inquiry into the purpose of a foreign sovereign's acts would not require a court to rule on the legality of those acts, and a finding concerning purpose would not entail the particular kind of harm that the act of state doctrine is designed to avoid. Dismissal of a complaint before the development of evidence, merely because adjudication raises the bare possibility of embarrassment, constitutes an unwarranted expansion of the act of state doctrine and is contrary to the flexibility with which that doctrine should be applied.

These statements represent our views. As the Department understands the allegations in the instant suit, the validity of the Nigerian Government's decision to award the contract in question is not in question. If the adjudication of this suit were to involve a judicial inquiry into the

---

10. Assistant United States Attorney Levy's representations at Kirkpatrick's sentencing, *supra* note 5, were not made in the course of these

proceedings, were not addressed to act of state questions, and antedated the Legal Adviser's letter by nearly a year.

motivations of the government of Nigeria's decision to award the contract, the Department does not believe the act of state doctrine would bar the court from adjudicating this dispute.

*See* Letter from Abraham D. Sofaer, Appendix to this Opinion (December 10, 1986) (emphasis in original).

■ In sum, the State Department is satisfied that the conduct of American foreign policy relative to Nigeria will not be compromised by orderly federal court adjudication of ETC's lawsuit.[11] We appreciate, of course, that the Department's legal conclusions as to the reach of the act of state doctrine are not controlling on the courts.[12] But the Department's factual assessment of whether fulfillment of its responsibilities will be prejudiced by the course of civil litigation is entitled to substantial respect.[13] As against that assessment, defendants have not developed a factual record "showing that adjudication may hinder international relations...." *Curtiss–Wright*, 694 F.2d at 304.

■ This litigation falls squarely within the teaching of *Curtiss–Wright*. In both cases, the plaintiff sought damages from defendants who allegedly used illegal tactics to influence a foreign government's award of a contract. In both cases, adjudicating the claims before the court would have required at most an inquiry only into the motivations behind, rather than the legality of, the foreign government's acts. And, finally, the defendants in each case failed to demonstrate that the litigation process was bound to result in the type of institutional conflict between the political and judicial branches that would justify invoking the doctrine. We therefore will reverse the court's grant of summary judgment, and will remand the case for further proceedings.[14]

## III.

Having found that the act of state doctrine is no bar to appellant's claims, we turn to the remaining issues presented. First, ETC argues that the district court erred in dismissing the state and federal racketeering claims. Second, ETC seeks reversal of the district court's order barring the deposition testimony of defendant Carpenter, who asserted his Fifth Amend-

---

**11.** The Legal Adviser's letter does urge the court to exercise "caution and due regard for foreign sensibilities" at each stage of the litigation. In particular, the court is asked "to endeavor to assure that no unnecessary inquiries are made, or allegations tested, during the course of discovery or trial." Interpreting this passage as a failure on the part of the Legal Adviser to "sign off" completely on the act of state question, the district court dismissed the Legal Adviser's caveats with respect to the production of evidence as impractical and unconstitutional. *See ETC,* 659 F.Supp. at 1398.

The Legal Adviser's expressions of concern about the possible damage to foreign relations that may result from wide-ranging discovery against foreign officials should not have been interpreted as a sign of ambivalence about the act of state question. Rather, the Legal Adviser simply urged the court to exercise appropriate supervision over discovery and other trial preparation to limit damage to foreign sensibilities. This advice is far from impractical. Foreign governments have often expressed their dissatisfaction with the wide discovery authorized under the Federal Rules, finding it intrusive and overbroad when compared to the European version of the fact-finding process. *See* Comment, *Antitrust Suits Involving Foreign Commerce,* 135 U.Pa.L.Rev. 1003, 1013–17 (1987). American ju-

dicial insensitivity to this foreign reaction has resulted in the enactment of "blocking" laws, *i.e.* laws that are specifically designed to block the Federal Rules' discovery provisions. *See id.* at 1016. The State Department's advice on this matter should be read as nothing more than a reminder to the district court of the complaints about American litigation with which the executive has become familiar.

**12.** *See supra* note 6.

**13.** That respect is, in our judgment, enhanced when the Legal Adviser is one who, in his former capacity as a federal judge, has addressed act of state problems with marked sensitivity and rigor in a particularly demanding context. *See Sharon v. Time,* 599 F.Supp. 538 (S.D.N.Y. 1984).

**14.** ETC has also argued that *Mannington Mills'* ten-factor balancing test should not result in a dismissal of the case on the basis of international comity. *See Mannington Mills,* 595 F.2d at 1297–98. Since the issue apparently was not raised below, and the record is substantially devoid of the sort of information called for by the *Mannington Mills* test, it would be inappropriate for this issue to be examined for the first time on appeal.

ment privilege when examined about Kirkpatrick's Air Force contract bid. Third, all of the defendants challenge the district court's determination that ETC has standing to bring its antitrust and racketeering claims. And, fourth, defendant DIC reiterates its contention that it is insulated from liability for any misdeeds of Kirkpatrick and Carpenter. We address these questions in turn.

A.

The district court dismissed ETC's state and federal racketeering claims because it concluded that the amended complaint failed to allege facts establishing a pattern of racketeering activity. Noting that this court had not formulated a definition of the RICO pattern requirement, the district court adopted a definition of pattern which would have required the appellant to allege facts establishing either (1) more than one criminal scheme undertaken by the defendants, or (2) a single, open-ended scheme. *See Environmental Tectonics v. W.S. Kirkpatrick & Co., et al.,* 659 F.Supp. 1381, 1390 (D.N.J.1987). The district court found that ETC's amended complaint met neither prong of this test because it alleged a single scheme which was neither "continuous" nor "on-going."

■ The pattern requirement accepted by the district court has since been rejected by this court. In *Barticheck v. Fidelity Union Bank,* 832 F.2d 36 (3rd Cir.1987), this court held that allegations of illegal conduct that constitute a single, completed criminal episode are in some circumstances sufficient to describe a pattern of racketeering activity. To determine whether a "pattern" exists, a court should consider a combination of specific factors such as the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity. *See id.* at 38–39; *Saporito et al. v. Combustion Engineering,* 843 F.2d 666, 676 (3rd Cir.1988).

■ The factual allegations in ETC's amended complaint satisfy this more flexi-

ble interpretation of RICO's pattern requirement. The predicate acts alleged in the amended complaint—mail and wire fraud, bribery, and violations of the Foreign Corrupt Practices Act—were all committed in connection with (or, to facilitate) the payments by Kirkpatrick to the Panamanian corporations. One could view these payments as a single illegal payment separated into installments, and thus as a one-time affair, rather than as "criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time." *Marshall–Silver Construction Co. v. Mendel, et al.,* 835 F.2d 63, 66–67 (3rd Cir.1987). But, to focus only on the series of payments—i.e., one bribe divided into four parts—is to ignore the complexity of Kirkpatrick's scheme. If the appellant's allegations are true, a European conglomerate, and two American corporations—successfully, and over a two-year period—organized to influence a foreign country's award of a procurement contract by illegal means. To facilitate their scheme, they hired a consultant who had contacts with Nigerian officials who were amenable to such an arrangement. This consultant also developed a sophisticated and outwardly legal front for the payments, thereby increasing the difficulty already inherent in detecting such a scheme. The wire and mail communications used to implement this undertaking account for numerous violations of federal law.

■ The nature of the acts alleged and the number of victims are also important considerations in this analysis. *See Barticheck,* 832 F.2d at 39. ETC claims to have suffered direct economic injury from the appellees' scheme. By illegally influencing the decisions of appellees' public officials, however, appellees have also created an even larger class of victims, the citizens of Nigeria. *Cf. Town of Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263, 1268 (3rd Cir.1987) (two separate schemes to bribe local government officials made victims of the "taxpayers and residents of the Town of Kearny"). Moreover,

because bribery of foreign officials by American businessmen diminishes this nation's stature and influence abroad, conduct of the kind here alleged victimizes the citizens of this nation as well.

Our assessment of the amended complaint in light of *Barticheck's* specific factors persuades us that ETC has alleged a "pattern of racketeering activity" within the meaning of the statute. ETC may proceed on its RICO claim, and—assuming, as have the district court and the parties, that the pattern requirements for the New Jersey Anti–Racketeering act are substantially similar—on its state racketeering claims as well.

### B.

ETC's final ground of appeal challenges the district court's decision that the Fifth Amendment privilege against self-incrimination shielded Carpenter from responding to deposition questions the answers to which might yield evidence that Carpenter had committed crimes under Nigerian law. ETC argues that the record does not establish any significant likelihood that responding to deposition questions here would expose Carpenter to trial in the courts of Nigeria. ETC also argues that, in any event, the Fifth Amendment is not a shield against foreign prosecution.

As summarized by the court below, the evidence adduced by Carpenter to establish the risk of criminal prosecution in Nigeria was as follows:

> Prior to his deposition, Carpenter submitted an affidavit … setting forth his reasons for fearing criminal prosecution in Nigeria and detailing the factual basis of the privilege. As discussed earlier in the opinion, defendants Kirkpatrick and Carpenter both pled guilty to violations of the FCPA in connection with the Nigerian Contract. According to Akindele, Carpenter's plea and sentencing were receiving considerable media attention and were "front page news" in Nigeria. Apparently, local news coverage of Carpenter's plea and sentencing were subsequently reported by Nigerian newspapers. Akindele also told Carpenter of certain Nigerian government officials' desire to prosecute Carpenter in connection with the Nigerian contract. Akindele further warned Carpenter not to travel to Nigeria and to exercise care in travelling in Europe or Africa because there was a risk he would be taken by force to Nigeria. In January, 1986, Carpenter's attorney was informed by a United States Government official that "the Nigerians wanted to get [Carpenter] to Nigeria." This information, which originally came from Interpol, was relayed to Carpenter. Carpenter has since been again warned not to travel abroad "and that the Nigerian interest in [his] case has not abated."

The magistrate reviewed this evidence in the light of the factors relevant to the risk of foreign prosecution enumerated by the Second Circuit in *In re Grand Jury Subpoena of Flanagan*, 691 F.2d 116, 121 (2nd Cir.1982):

> [T]he court in resolving the issue [must focus on] whether there is an existing or potential prosecution of [the witness]; what foreign charges could be filed against him; whether prosecution of them would be initiated or furthered by his testimony; whether any such charges would entitle the foreign jurisdiction to have him extradited from the United States; and whether there is a likelihood that his testimony given here would be disclosed to the foreign government.

The magistrate found "that, by defendant Carpenter's affidavit, there is a real fear that he might involuntarily be subject to the criminal jurisdiction of Nigeria." The district court concluded that "[t]he Magistrate's decision has not been shown to be clearly erroneous or contrary to law." *ETC*, 659 F.Supp. at 1401.

We disagree. We have no doubt that the testimony ETC sought to elicit at deposition might aid in a criminal prosecution of Carpenter by Nigeria, if such a prosecution were undertaken. However, it is not contended that Carpenter, who has already pleaded guilty to the criminal charges brought by the United States, could be extradited to Nigeria for the al-

leged bribes. The entire risk of prosecution in Nigeria rests, therefore, on the possibility that Carpenter would be kidnapped by Nigerian authorities; and we do not think that possibility comes close enough to being a significant likelihood to carry the day. We are prepared to assume that a real fear, substantially grounded in fact, of being kidnapped by the agents of a foreign government with a view to prosecution by that government might well justify a witness' assertion of his or her fifth amendment privilege. But the fact that Carpenter has been admonished to avoid being kidnapped does not, in our judgment, constitute substantial proof that the feared conspiracy is more than gossamer. Nothing in this record supports an inference that kidnapping foreigners not resident in Nigeria in order to bring them to trial in Nigeria is characteristic of Nigerian law enforcement personnel.

■ That Carpenter is sincere in his apprehension of the risk does not mean that the apprehension justifies his assertion of the privilege. "The apprehension," as the court noted in *Flanagan*, "must be a real and reasonable one, based on objective facts as distinguished from subjective ... speculation." *Flanagan*, 691 F.2d at 121. And this is because, as the Supreme Court made plain in *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972), rejecting the Fifth Amendment claim presented there, "the privilege pro-

tects against real dangers, not remote and speculative possibilities." In short, we think the record made by Carpenter does not constitute substantial evidence of "real dangers." [15]

As noted above, ETC further contends that the Fifth Amendment is only a domestic shield, which guards against self-incrimination in other American courts, whether state or federal,[16] but does not protect one from American court orders which would compel testimony that might threaten incrimination in the courts of a foreign sovereign. That issue, which the Supreme Court found unnecessary to resolve in *Zicarelli, supra*, has generated a contrariety of views in the lower courts. The Tenth Circuit, *In re Parker*, 411 F.2d 1067, 1070 (10th Cir.1969), *vacated as moot*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970), and the Fourth Circuit, *United States v. (Under Seal)*, 794 F.2d 920 (4th Cir.1986), have rejected the contention that the Fifth Amendment is extra-territorial in scope. The chief authority in support of an extra-territorial application is Judge Newman's opinion in *In re Cardassi*, 351 F.Supp. 1080 (D.Conn.1972). *Cardassi* has been subscribed to by Judge Hufstedler, concurring in *In re Federal Grand Jury Witness*, 597 F.2d 1166, 1169 (9th Cir.1979), and has been followed by two district courts in this circuit. *See United States v. Trucis*, 89 F.R.D. 671 (E.D.Pa.1981); *United States v. Kowalchuk*, No. 77–118 (E.D.Pa.1978).[17]

**15.** Carpenter might have met his burden under this standard if he had been officially warned by the United States Government to forgo travelling abroad in order to avoid capture by Nigerian agents seeking to bring him to Nigeria for trial. Other evidence—*e.g.* a pending prosecution or the institution or threatened institution of extradition proceedings—might also have supported Carpenter's assertion of the privilege.

The justifications that Carpenter advances in this case, however, amount to nothing more than speculation about Nigeria's intentions. First, the warnings by Benson Akindele, who does not appear to be a Nigerian official, do not, standing alone, provide a basis for Carpenter's fear of prosecution. And the somewhat ambiguous representation of Assistant United States Attorney Steven Levy with respect to Nigeria's "vital interest" in the American prosecution of Carpenter, *supra* note 5, falls short of suggesting

that Nigeria was preparing to prosecute Carpenter.

Second, what Carpenter identifies as a warning from the United States is actually something more remote. The record suggests that the Nigerian government, if interested at all in Carpenter, sought only to question him about others rather than prosecute him. Moreover, Carpenter himself was not troubled enough by the warning to stay in the United States: he later travelled to the Bahamas. To justify his invocation of the privilege, Carpenter would have had to come forward with a good deal more than he presented to the magistrate.

**16.** *See Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

**17.** The question has been discussed, but not resolved, by the District of Columbia Circuit in *In re Sealed Case*, 825 F.2d 494, 497 (D.C.Cir.

Because we have determined that the present record does not, in any event, present a substantial risk that Carpenter would be subject to prosecution in the courts of Nigeria, we find it unnecessary to resolve the important constitutional question as to the reach of the Fifth Amendment that would otherwise be presented.

### C.

On cross-appeal, defendants raise two objections to rulings by the district court. The first contention, joined in by all of the defendants, is that the district court erred in concluding that ETC had standing to press its antitrust, RICO, and New Jersey Anti–Racketeering Act claims. This argument is premised on what the defendants perceive as factual deficiencies in ETC's amended complaint. In their view, ETC has not pleaded any facts which would establish, if true, that but for the defendants' illegal conduct it would have received the Air Force contract. The defendants also argue that ETC has pleaded no facts that would establish the payment of illegal commissions from the defendants to Nigerian government officials. The district court concluded that the amended complaint's allegations were sufficient to confer standing on ETC, and we agree with that assessment.

■■■ As far as ETC's antitrust standing is concerned, the allegations in the amended complaint as a whole make out an actionable violation of section 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c).[18] Congress enacted section 2(c), the Act's brokerage provision, primarily to curb one particular abuse by large chain store buyers, namely the use of "dummy" brokerage fees as a means of securing price rebates. *See Seaboard Supply Co. v. Congoleum*

*Corp.*, 770 F.2d 367, 371 (3rd Cir.1985). The section has also been applied, however, in cases that involve commercial bribery. *See id.* at 371; *see also Rangen, Inc. v. Sterling Nelson & Sons, Inc.*, 351 F.2d 851 (9th Cir.1965), *cert. denied* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966) (company which bribed state purchasing agent liable to competitor for state contract under 2(c)).

Although this court has concluded that as a general matter commercial bribery is actionable under 2(c), it has also held that a plaintiff must show that the illegal payments in question crossed the line from buyer to seller or vice versa. *See Seaboard Supply*, 770 F.2d at 372. The amended complaint alleges that Kirkpatrick paid the illegal commissions to the Akindele-controlled corporations, from which they were distributed to unnamed Nigerian officials. Though the allegation is not a detailed one, it clearly charges that illegal payments were passed from a seller to a buyer—a violation of 2(c).

■■■ Not every plaintiff who alleges an actionable claim under the antitrust laws has standing, however, to bring a private antitrust action. In order to proceed with a claim, a plaintiff must be able to demonstrate that it is within the class of those injured in their business or property who, based on a variety of factors, are best suited to further the purposes of the statute by remedying the violation alleged. *See Alberta Gas Chemicals, Ltd. v. E.I. Du Pont De Nemours and Co.*, 826 F.2d 1235, 1240 (3rd Cir.1987). A private plaintiff does not have to prove price discrimination to recover for a violation of 2(c), *Seaboard Supply*, 770 F.2d at 371 n. 3, but the plaintiff must still meet the standing requirements to proceed. *See Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 270–72 (5th Cir.1979).

---

1987), and by the Second Circuit in *Flanagan*, 691 F.2d at 124.

**18.** 15 U.S.C. § 13(c) states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative or intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control of any party to such transaction other than the person by whom such compensation is so granted or paid.

Because of the standing doctrine's malleability, it would be difficult to define with precision the contours of the class of potential plaintiffs who have standing to assert 2(c) claims. Indeed, this court's case-by-case approach to the standing requirement argues against such an attempt. *See Alberta Gas Chemicals*, 826 F.2d at 1239–41. We need not do so in this case, moreover, because it is generally agreed that a direct competitor of a company that obtains a contract through commercial bribery has standing to press a 2(c) claim against the briber. *See Cool Attic*, 587 F.2d at 271–72; *Municipality of Anchorage v. Hitachi Cable*, 547 F.Supp. 633, 640 (D.Alaska 1982); *Computer Statistics v. Blair*, 418 F.Supp. 1339, 1348 (S.D.Tex.1976); III E. Kintner and J. Bauer, *Federal Antitrust Law* § 26.12, at 529–30 (1982).

█ We agree with the district court that ETC's amended complaint alleged sufficient facts to establish the kind of injury that would confer standing to bring a claim against the defendants. Plaintiff alleged that it and the defendants are both in the business of supplying aeromedical facilities and equipment to foreign air forces, and that both plaintiff and defendants were in direct competition for the Nigerian Air Force bid. As the district court noted, short of alleging that it was next in line for the Nigerian contract, ETC could not have pleaded a more direct injury from defendants' alleged violation of section 2(c).

█ The question of ETC's standing to bring its RICO and Anti–Racketeering Act claims is somewhat easier to resolve. To have standing to assert a civil RICO claim, ETC need only allege an injury to its business or property resulting from some or all of the predicate acts that comprise the RICO violation. *See Town of Kearny*, 829 F.2d at 1268 (quoting *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806 (7th Cir.1987)). ETC's allegations in the amended complaint of injury from the bribery scheme—a scheme that the amended complaint charges with sufficient factual specificity—meet this standard. We also assume, as did the district court and the parties, that the New Jersey Anti–Racketeering Act's standing requirement is essentially the same as the federal standard.

### D.

Finally, defendant DIC, one of Kirkpatrick's corporate parents, contends that it is entirely immune from liability. ETC claims that liability for the alleged wrongful acts of the Kirkpatrick group can be imputed to DIC on either of two theories: by piercing the defendant's corporate veil, *Melikian v. Corradetti*, 791 F.2d 274 (3rd Cir.1986), or by finding that Carpenter acted as DIC's agent in carrying out the bribery scheme, *Japan Petroleum Co. v. Ashland Oil*, 456 F.Supp. 831 (D.Del.1978). The district court found that the amended complaint minimally alleged "a relationship among [DIC], IDC, Carpenter, and Kirkpatrick sufficient to support the potential imposition of liability upon [DIC] or IDC for wrongful acts committed by Carpenter and/or Kirkpatrick." *ETC*, 659 F.Supp. at 1388. The court also concluded that ETC and the defendants should have the opportunity to proceed with discovery so that the facts defining the relationship of DIC, IDC, Carpenter and Kirkpatrick may be fully developed. *See id.* at 1389. We find no reason to question such a course, which should produce a record on the basis of which the question of DIC's liability can be properly determined. *See Craig v. Lake Asbestos of Quebec, Ltd.*, 841 F.2d 145 (3rd Cir.1988).

### *Conclusion*

We therefore will reverse the district court on its act of state decision, its dismissal of plaintiff's RICO and Anti–Racketeering Act claims, and its affirmance of the magistrate's decision upholding Carpenter's assertion of the Fifth Amendment privilege. As to the other issues, we will affirm the district court. We will remand this case for proceedings consistent with this opinion.

### APPENDIX

United States Department of State

The Legal Adviser

Washington, D.C. 20520

December 10, 1986

The Honorable

Alfred J. Lechner, Jr.

United States District Court Judge

District of New Jersey

U.S. Post Office and Courthouse

Newark, N.J. 07101

Re: *Environmental Tectonics Corporation, International v. W.S. Kirkpatrick & Co. Inc., et al.*, Civil Action No. 86–796

Dear Judge Lechner:

I am writing on behalf of the Department of State in reply to the Court's invitation to the Department to express its views of the above-referenced civil action in light of defendant's motion to dismiss on the basis of the act of state doctrine. This court has indicated in particular that it might become necessary to examine the motivation of officials of the Republic of Nigeria in taking certain public actions. The Department appreciates the Court's consideration in offering this opportunity for comment.

In recent years, the United States Executive Branch has addressed the question of whether the act of state doctrine requires dismissal of proceedings that may call for judicial inquiry into the *motivations* (as opposed to the legal validity) of the public acts of foreign states. Specifically, as the United States stated in an *amicus curiae* brief before the United States Supreme Court:

[W]hile judicial examination of purpose may on occasion implicate some of the concerns underlying the act of state doctrine, that doctrine only precludes judicial-questioning of the *validity* or *legality* of foreign government actions....

None of this Court's decisions suggest that the act of state doctrine precludes all judicial inquiries that may embarrass a foreign state or affect the political branches' conduct of foreign relations. Rather, the act of state doctrine is based on the need to avoid unprincipled decisions resulting from the absence of legal standards, and the unique embarrassment, and the particular interference with the conduct of foreign affairs, that may result from the judicial determination that a foreign sovereign's acts are invalid. Judicial inquiry into the purpose of a foreign sovereign's acts would not require a court to rule on the legality of those acts, and a finding concerning purpose would not entail the particular kind of harm that the act of state doctrine is designed to avoid. Dismissal of a complaint before the development of evidence, merely because adjudication raises the bare possibility of embarrassment, constitutes an unwarranted expansion of the act of state doctrine and is contrary to the flexibility with which that doctrine should be applied. (Emphasis added).

*See* United States Government briefs *amicus curiae* in support of petitions for a writ of *certiorari* in *Industrial Investment Development Corp. v. Mitsui & Co., Ltd.*, 594 F.2d 48 (5th Cir.1979), *cert. denied*, 445 U.S. 903 (1980); and in *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir.1977), *cert. denied*, 434 U.S. 984 (1977), excerpts *reprinted in* 1979 *Digest of U.S. Practice in International Law* at 965 and 969, respectively.

These statements represent our views. As the Department understands the allegations in the instant suit, the validity of the Nigerian Government's decision to award the contract in question is not in question. If the adjudication of this suit were to involve a judicial inquiry into the motivations of the Government of Nigeria's decision to award the contract, the Department does not believe the act of state doctrine would bar the Court from adjudicating this dispute.

Moreover, the Department is of the view that the act of state doctrine may not apply to the award of the contract in question, to the extent that such award does not constitute a sufficiently formal expression of Nigeria's public policy or interests. *See, e.g., Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976); *compare Sage Int'l., Ltd. v. Cadillac Gage*

*Co.*, 534 F.Supp. 896, 908 (E.D.Mich.1981) *with General Aircraft Corp. v. Air America, Inc.*, 482 F.Supp. 3 (D.D.C.1979).

Apart from the act of state question, however, inquiries into the motivation and validity of foreign states' actions and discovery against foreign government officials may seriously affect United States foreign relations. These concerns, in the context of this litigation, counsel that caution and due regard for foreign sovereign sensibilities be exercised at each relevant stage in the proceedings. Moreover, the court should endeavor to assure that no unnecessary inquiries are made, or allegations tested, during the course of discovery or trial.

I hope this letter will be helpful in your disposition of the above-referenced action.

Sincerely,

Abraham D. Sofaer