**Helen R. GARSIDE, dba Emerald Distributing Company, Plaintiff,**

v.

**EVEREST & JENNINGS INTERNATIONAL, Everest & Jennings, Inc., the Jennings Investment Co., Defendants.**

**Civ. No. S–80–82 MLS.**

United States District Court, E.D. California.

April 10, 1984.

Jeremiah F. Hallisey, O'Brien & Hallisey, Saveri & Saveri, Guido Saveri, Charles Lamont, San Francisco, Cal., Cotchett, Dyer & Illston, San Mateo, Cal., for plaintiff.

Walter Kuhlmey, Thomas P. Coffey, Samuel A. Haubold, Jack Rovner, Kirkland & Ellis, Chicago, Ill., Forrest A. Plant, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for defendants.

Leslie G. Levin, Beverly Hills, Cal., for various claimants.

## MEMORANDUM OF DECISION GRANTING MOTION FOR DIRECTED VERDICT

MILTON L. SCHWARTZ, District Judge.

Trial of this class action case was begun on March 6, 1984, before a jury. At the conclusion of plaintiff's case, defendants moved, both orally and in writing, for a directed verdict under Fed.R.Civ.P. 50(a), following which written briefs and oral arguments were submitted on both sides. On March 20 the undersigned, in open court, orally issued an order granting the motion and generally outlining the basis for the ruling. This memorandum of decision constitutes a formal memorialization of that order and the reasons therefor.

## I. NATURE OF THE CASE.

This is an antitrust class action prosecuted on behalf of those persons and entities (with certain named exclusions) who purchased wheelchairs from defendants and/or any of their affiliated subsidiaries and alleged co-conspirators during the period May 6, 1973 through January 31, 1980. The suit is maintained pursuant to the authority of Section 4 of the Clayton Act (15 U.S.C. § 15) and asserts the following actionable misconduct:

(1) Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) in conspiring to monopolize the manufacture and sale of wheelchairs in the United States by suppressing and eliminating competition;

(2) Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) in attempting to monopolize the manufacture and sale of wheelchairs in the United States by suppressing and eliminating competition; and/or

(3) Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) in monopolizing the manufacture and sale of wheelchairs in the United States by suppressing and eliminating competition.

The relevant product market was determined, pursuant to stipulation, to consist of "all chair-like devices mounted on wheels designed to provide mobility to the handicapped." Final Pretrial Order, dated February 7, 1984, par. 3 and Exhibit A thereto (par. 7). The relevant geographic market was determined, pursuant to stipulation, to

embrace the entire United States. Final Pretrial Order, dated February 7, 1984, par. 3 and Exhibit A thereto (par. 8).

## II. PERTINENT LAW.

■ A. *Directed Verdict.* The standard to be applied by the trial court in evaluating a motion for directed verdict is fully set forth in *California Computer Products, Inc. v. International Business Machines Corporation,* 613 F.2d 727, 733–34 (9th Cir.1979), an antitrust case:

> As a general rule, the district court has the power to direct a verdict if 'the evidence permits only one reasonable conclusion as to the verdict.' [citations omitted.] The district court must consider all the evidence—both favorable and unfavorable. But in order to avoid passing on the credibility of witnesses and weighing contradictory evidence, the court must resolve all inferences in favor of the party with the burden of persuasion, because '[i]t is the jury, not the judge, which "weighs the contradictory evidence and inferences, judges the credibility of witnesses, ... and draws the ultimate conclusion as to the facts ...."' [citations omitted.]
>
> In order to benefit from the favorable inferences available under this standard, the party against whom the motion is made must present 'substantial evidence.'...
>
> '[A] directed verdict is proper, even in an antitrust case, when "there is no substantial evidence to support the claim."' [citations omitted.]

B. *Required Elements of Proof.*

1. In order to establish the Sherman I "conspiracy" violation charged in this case, plaintiff must prove (i) an agreement among two or more persons or distinct business entities, (ii) an intent to harm or unreasonably restrain, and (iii) an actual anti-competitive antitrust injury. *Reid Bros. Logging Co. v. Ketchikan Pulp Co.,* 699 F.2d 1292, 1296 (9th Cir.1983); *Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 844 (9th Cir.1980).

2. In order to establish the Sherman II "attempt to monopolize" violation, plaintiff must prove (i) a specific intent to control prices or destroy competition in some part of commerce, (ii) predatory or anti-competitive conduct directed to accomplishing the unlawful purpose, (iii) dangerous probability of success, and (iv) antitrust injury. *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 887 (9th Cir.1982); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1027 (9th Cir.1982); *California Computer Products,* 613 F.2d at 736.

3. In order to establish the Sherman II "monopolization" violation, plaintiff must prove (i) possession of monopoly power in the relevant product and geographic markets, (ii) willful acquisition or maintenance of that power, and (iii) antitrust injury. *California Computer Products,* 613 F.2d at 735.

## III. ANALYSIS OF THE PROOF.

■ A. *The Sherman I Conspiracy Claim.* The court is satisfied that there was substantial evidence of the first two elements, namely, (i) an agreement and (ii) an intent to unreasonably restrain, notwithstanding that most of such evidence reflected acts and statements occurring between 15 and 18 years prior to the commencement of the relevant time period in 1973. This evidence consists of the 1955 joint venture agreements involving the ownership and operation of Zimmer Orthopedic Limited ("ZOL"), a United Kingdom corporation, and Ortopedia GmbH ("O–K") of Kiel, West Germany, and accompanying exclusive distributorship agreements appointing one of the defendants as the exclusive distributor of ZOL and O–K chairs in the United States and Canada. It also consists of various written and oral statements by representatives of defendants indicating a possible intent to exclude from competition in the United States wheelchairs manufactured in England and West Germany—and perhaps in other foreign countries.

The court is equally satisfied, however, that there was no substantial evidence of any actual antitrust injury sustained by the class representative or any, let alone all, members of the plaintiff class.

Plaintiff chose to present her case on what proved to be a greatly oversimplified theory. She contended (1) that defendants' conduct was successful in excluding foreign competition in the wheelchair market, particularly competition from ZOL, O–K and the Canadian and Mexican companies purchased by defendants; (2) that by reason of defendants' alleged position of market dominance, they were able to and did charge more for their wheelchairs than they would have been able to charge for the same merchandise in a freely competitive market, i.e., in a market where foreign imports had not been improperly excluded; (3) that by reason of the foregoing, every person or entity who purchased a wheelchair from defendants during the relevant time period paid a measurable amount in excess of the true competitive price.

The first notable failure of proof is that no evidence, let alone substantial evidence, was offered to prove that any foreign-made wheelchairs were sought to be imported for sale in the United States to compete with defendants and other domestic manufacturers in this country. Similarly, there was no expert or other evidence to suggest that but for defendants' joint venture, distributorship, purchase and other agreements, any manufacturers in England, West Germany, Canada, Mexico or elsewhere would have exported, or could economically have afforded to export, wheelchairs to the United States to compete with those made in this country. In fact, what scant evidence there is on the subject seems to compel the opposite conclusion; in June 1975 defendants gave up their interest in ZOL and their exclusive dealership rights to handle ZOL chairs in the United States, but notwithstanding this total removal of any impediment to such competition, there is no evidence that at any time thereafter ZOL sought to export its chairs to or compete in the United States. In sum, there was no evidence offered to show that *any* potential foreign competitor had the necessary desire, intent and capacity to enter the United States wheelchair market between May 6, 1973 and January 31, 1980. It must be concluded, therefore, that no reasonable jury could find that foreign competition had been suppressed to the damage of domestic wheelchair purchasers.

An additional, and entirely separate, failure in the proof inheres in the method by which plaintiff sought to establish the "competitive price"—it being contended that defendants' supracompetitive prices constituted the antitrust injury. Plaintiff's expert witness, Dr. Gemello, first selected four companies, which he concluded comprised the "competitors" after discussion with an expert witness in another case and reviewing certain deposition materials furnished to him by plaintiff's counsel, and compared certain of their *recommended* retail prices to those of defendants. The detailed procedure employed was as follows:

(1) He took the respective prices recommended by each of the "competitors" for the highest price chair sold by each, for each of the relevant years, added those prices together for each year and divided by four to obtain the average recommended price for any given year for the "higher quality" chair;

(2) He next applied a standard 40% discount to this average figure, to obtain the average sale price to a dealer for the "higher quality" chair;

(3) He then repeated the process described in (1) and (2) for the "lower quality" chair by doing the same calculations with the lowest price chair of each of the same four manufacturers;

(4) He turned then to defendants' chairs and calculated the prices charged by them to their dealers for the same years—again, by calculating the recommended prices for the "higher quality" chairs and the "lower quality" chairs, respectively, and discounting such amounts by 40%.

(5) He concluded that the yearly average amounts calculated in (2) and (3) represented the "competitive market prices in the United States" for the "higher quality" and the "lower quality" chairs, following which he compared such prices to those calculated in (4) to show the amount, if any, of the excess over market charged by defendants each year;

(6) Finally, he added together for each year the average amount for the "higher quality" chair calculated in (2) and the average amount for the "lower quality" chair calculated in (3), and divided the sum by two, in order to obtain a single "average competitive price" for each year, following which he performed a similar averaging of the high and low for defendants' chairs for each year; the difference is alleged to constitute the percentage of "overcharge," if any, for *all wheelchairs* sold by defendants.

The theory and calculations are far too speculative to support a finding consistent therewith by any reasonable jury; additionally, they are unsupported by substantial evidence. The failures consist notably of the following on the part of Dr. Gemello:

(1) He made no effort to ascertain or include in his price averaging calculations the amounts charged by numerous (more than 25) other domestic wheelchair manufacturers during the relevant years;

(2) He had no knowledge of, and made no effort to ascertain, the prices recommended by the various manufacturers, including defendants, for their various intermediate price chairs, contenting himself with finding the prices of only the top and the bottom and ignoring the prices for numerous in-between chairs;

(3) He had no knowledge of, and made no effort to ascertain, whether the highest price chair for all or any of the other manufacturers, and/or the lowest price chair, was of lesser, equal or superior quality to that manufactured by defendants; he simply assumed, without even hearsay substantiation, that all of the selected highest price chairs were of equal quality with those made by defendants and all of the selected lowest price chairs were of equal quality with those made by defendants;

(4) Even if one could overlook plaintiff's unexplainable limitation of competitors to only four, and could accept the decision to average and compare only top and bottom prices, excluding all prices in between, there are still insuperable difficulties:

(a) For reasons which Dr. Gemello can neither recall nor explain, he used the second-highest price chair of one competitor (Invacare), rather than its highest price chair, for one year in making his comparisons of the "higher quality" chair;

(b) In making his "lower quality" chair comparisons Dr. Gemello used an average of defendants' lowest price chair and their next-to-lowest price chair, rather than simply using the lowest price chair as he did for all the selected competitors—without giving a reasonably satisfactory explanation;

(c) Dr. Gemello failed to include for analysis or comparative purposes power operated wheelchairs with their differing standard dealer discounts;

(d) In Dr. Gemello's price comparisons he did not attempt to ascertain manufacturers' differing practices in granting quantity and/or time-of-payment discounts to dealers.

The court finds, therefore, that no reasonable jury could accept the method or the underlying assumptions indulged by plaintiff (1) in calculating what the freely competitive market price for any of defendants' wheelchairs would have been in any of the relevant years, or (2) in proving that defendants' prices for any of their wheelchairs exceeded whatever such competitive market price may have been. Perhaps the most significant single factor in compelling this conclusion is that plaintiff seems to be treating wheelchairs as if they are fungible items, each one readily substitutable for all others, despite the uniform testimony of all witnesses that there are all manner of

grades, quality, durability and configuration, not to mention substantial differences in public perception and acceptance. As defendants' counsel accurately observed in oral argument, plaintiff assumes that we can compare the highest price Cadillac to the highest price Toyota and conclude therefrom that Cadillac is overcharging.

■ B. *The Sherman II Attempt to Monopolize Claim.* As indicated in Section II, B, 2 above, plaintiff has the burden of establishing four specified elements in order to prevail on her claim of unlawful attempt to monopolize. She did in fact present sufficient evidence to go to the jury on the first two elements, (i) specific intent to restrain competition from foreign manufacturers, and (ii) anti-competitive conduct directed to accomplishing this purpose, in the form of the evidence described in Section III, A above. There was, however, no substantial evidence to satisfy the remaining two required elements, (iii) dangerous possibility of success and (iv) antitrust injury.

There was no evidence tending to show that defendants had a strong or dangerous possibility of succeeding in whatever attempt they might have made to monopolize the domestic market by attempting to suppress competition from foreign sources—or otherwise. The evidence is undisputed that defendants sold their wheelchairs in the United States entirely to non-exclusive dealers who were free to buy from all or any of the available manufacturers—some 30 or more in number. There was no evidence to suggest that defendants pressured or attempted to intimidate dealers into boycotting other manufacturers or to buy exclusively from defendants. In short, there was no evidence from which a reasonable jury could find that there was a dangerous possibility that defendants might succeed in unlawfully monopolizing the U.S. market.

With respect to element (iv), antitrust injury, the same failure of proof pertains here as in the Sherman I claim discussed in Section III, A above.

■ C. *The Sherman II Monopolization Claim.* As pointed out in Section II, B, 3 above, plaintiff must prove three elements to establish this claim: (i) possession of monopoly power in the relevant product and geographic markets, (ii) willful acquisition or maintenance of that power, and (iii) antitrust injury. The court has concluded that there was no substantial evidence of any of the three of these elements.

The only evidence offered to show possession of monopoly power was the testimony of Dr. Gemello to the effect that defendants' share of the domestic wheelchair market from 1973 through 1979 ranged from 57.9% to 64.2%, as is more particularly shown on Exhibit 109. It must be noted at the outset that the accuracy of these calculations is suspect. First, he employed allegedly comparative figures from a total of only five manufacturers, defendants and four other companies, ignoring some 25 or more other competing manufacturers—with the explanation that the expert witness in another case had told him all other manufacturers together account for such a small part of the market that it would not alter the percentage figures even if the sales of all of them were added into the calculation. He made no effort to determine who and how many such other manufacturers existed during the years in question and the respective amounts of sales generated by them.

Second, Dr. Gemello employed gross sales figures from each of the five companies, comparing defendants' sales to each of the other four, by examining their respective financial statements. In doing so he had to employ considerable "judgment" in deciding what amounts should be subtracted from gross sales as representing sales of non-relevant products. Additionally, assuming that defendants' prices were higher, it seems obvious that a simple comparison of dollar sales amounts, as opposed to unit sales volume, would not accurately reflect percentage of market control.

Assuming, *arguendo*, that the foregoing shortcomings were not present and that a reasonable jury could find defendants'

share of the relevant market to be as testified by Dr. Gemello, the undulating percentages of market control (from 57.9% to 64.2%) during the applicable seven years do not alone constitute substantial evidence of monopoly power. When we look for other evidence to combine with these percentages, we find only the possible attempts by defendants to exclude foreign competitors—without any proof that any such alleged competitors would or could have entered the United States market but for such attempts. Thus, the court concludes that there is no substantial evidence of monopoly power by defendants.

It follows, of course, that if there was no substantial evidence of monopoly power possessed by defendants, there could be no willful acquisition or maintenance of monopoly power, and therefore the proof necessarily failed as to the second element of this claim.

Finally, the proof necessary for the third element, antitrust injury, failed for the same reasons and in the same particulars as pertains to the Sherman I claim discussed in Section III, A above.

IV. CONCLUSION.

For the reasons and upon the grounds hereinabove set forth, the court reaffirms its granting of defendants' motion for directed verdict as to all three claims.