FORUM PUBLICATIONS, INC.

v.

P.T. PUBLISHERS, INC. and George E. Ludlow and American Physical Therapy Association.

Civ. A. No. 88–5926.

United States District Court, E.D. Pennsylvania, Civil Division.

Oct. 27, 1988.

Francis Recchuiti, Norristown, Pa., for Forum Publications, Inc.

Donald B. Lewis, Philadelphia, Pa., John T. Kotelly, Peter W. Morgan, Larry F. Eisenstate, Washington, D.C., for P.T. Publishers, Inc. and George E. Ludlow.

A. Roy DeCaro, Philadelphia, Pa., Clifford D. Stromberg, Washington, D.C., for American Physical Therapy Ass'n.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Plaintiff, Forum Publications, Inc. is the publisher of *Physical Therapy Forum*, a newspaper circulated to physical therapists throughout the United States. Defendants P.T. Publishers, Inc. ("P.T.P.") and George E. Ludlow, President of P.T.P., publish *P.T. Bulletin*, another newspaper for physical therapists, under a license agreement with Defendant American Physical Therapy Association ("A.P.T.A."), the principal professional association for physical therapists in the United States. The complaint alleges that Defendants incorrectly and fraudulently made certain statements[1] in *P.T. Bulletin* over the period of several years. The complaint alleges that these fraudulent statements were made pursuant to a conspiracy to "[monopolize] the market for

---

1. E.g., *P.T. Bulletin* is the "only professional forum for physical therapists published weekly"; *P.T. Bulletin* "reaches all P.T.'s nationwide" and has the "nation's largest P.T. circulation"; *P.T. Bulletin* has "54% greater circulation than any other P.T. publication"; "the circulation of *P.T. Bulletin* is 84,000, and that is twice as large a circulation as any other *P.T. Publication*"; "no other publication comes anywhere near this impressive circulation"; and "our 65 year old association stands behind our circulation figures."

physical therapy job placement advertising, [force] plaintiff out of business, and [obtain] for themselves all revenues which could be derived from regional and national physical therapy job placement advertising." Cplt. paragraph 8. Count One of the Complaint is based on the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. section 1961 *et seq.;* Count Two on the Antitrust Laws of the United States, 15 U.S.C. section 1 *et seq.;* Count Three and Count Four on the common law doctrines of Injurious Falsehood and Interference with Contractual and Business Relations. All three Defendants have moved for dismissal of the Complaint for failure to state a claim, or in the alternative, for summary judgment. In addition, Defendant Ludlow seeks dismissal for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2).

Count One: RICO

■ The Racketeer Influenced Organizations Act, 18 U.S.C. sections 1961 et seq., makes it unlawful, inter alia, "for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. section 1962(b). It is also unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. section 1962(c). "Racketeering activity" is defined in 18 U.S.C. section 1961 as including "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ..." Plaintiff alleges that Defendants violated sections 1341 and 1343 of the United States Code by making false and fraudulent statements in *P.T. Bulletin* as well as on the

telephone. It seeks civil damages under section 18 U.S.C. section 1964(c).

Although Congress enacted RICO primarily to eliminate "the infiltration of organized crime and racketeering into legitimate organizations'," S.Rep. 617, 91st Cong., 1st Sess., at 76, RICO in practice "is evolving into something quite different from the original conception of its enactors." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 500, 105 S.Ct. 3275, 3287, 87 L.Ed.2d 346 (1985). The Supreme Court in *Sedima* explained that RICO has begun to be used "against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct ..." *Id.,* 473 U.S. at 499, 105 S.Ct. at 3286.[2] A bare majority of the Court accepted the expanded RICO application:

It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster [footnote omitted]. Yet this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.... The 'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern.'

*Id.,* 473 U.S. at 499–500, 105 S.Ct. at 3286–87.

After *Sedima,* courts have restricted the application of RICO in civil cases by focussing on the requirement of section 1962 that there be a "pattern" of racketeering activity. Certain language in *Sedima*[3] "has

---

**2.** In *Sedima,* plaintiff corporation, which had entered into a joint venture with another company, sued that company under RICO for fraudulently cheating it out of a portion of its proceeds.

**3.** *See Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14:

As many commentators have pointed out, the definition of a 'pattern of racketeering activity' differs from the other provisions in [sec-

been widely viewed as a signal to the federal courts to fashion a limiting construction of RICO around the pattern requirement and the concepts of 'continuity' and 'relationship.' " *Barticheck v. Fidelity Union Bank/First Nat. State*, 832 F.2d 36 (3d Cir.1987).[4] The court in *Barticheck* "concluded that a case-by-case analysis should be undertaken to determine 'the extent of the racketeering activity.' " *Saporito v. Combustion Engineering Inc.*, 843 F.2d 666, 676 (3d Cir.1988), *citing Barticheck*, 832 F.2d at 40. Furthermore, the *Barticheck* court

> indicated that a determination of whether the facts alleged comprise a RICO pattern with the requisite 'continuity plus relationship,' *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 285 n. 14, turns on a combination of the following factors: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity.

*Saporito*, 843 F.2d at 676, *citing Barticheck* 832 F.2d at 39.

The meaning of the *Barticheck* test has been fleshed out in three Third Circuit cases. In *Marshall–Silver Const. Co., Inc. v. Mendel*, 835 F.2d 63 (3d Cir.1987), the Court of Appeals upheld the dismissal of a RICO claim for failure to allege a sufficient "pattern" of racketeering activity. In *Marshall–Silver*, a general contractor alleged that an engineering firm, its officers, and its law firm fraudulently forced the plaintiff into bankruptcy over the course of a year by filing a petition for involuntary bankruptcy against the general contractor and by notifying the press, who subse-quently reported that the general contractor was bankrupt. The Third Circuit concluded:

> *The target of the RICO statute*, as its name suggests, *is criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time.* Here we have a single victim, a single injury, and a single, short-lived scheme with only two active perpetrators [footnote omitted]. This is not a criminal activity with the kind of continuity of which we spoke in *Barticheck*.

*Marshall–Silver*, 835 F.2d at 67. (Emphasis added).

The next Third Circuit case to discuss the "pattern" requirement was *Saporito v. Combustion Engineering Inc.*, 843 F.2d 666 (3d Cir.1988). In *Saporito*, the plaintiffs alleged that the employer company and four of its officers "induced [them] to retire under one retirement plan while at the same time concealing from them but disclosing to certain other employees the development of a second, more generous plan." *Id.* at 667. The court concluded that the plaintiffs had alleged a "pattern" of racketeering in that there were at least five perpetrators, more than thirty-two unlawful acts, thirty-two victims, and virtually identical fraudulent acts committed over a six-month period.

Finally, in *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir.1988), one manufacturer of aeromedical equipment sued another manufacturer for bribing Nigerian officials in order to receive a contract from the Nigerian government. Plaintiff alleged that Defendant formed two Panamanian corporations to re-

tion] 1961 in that it states that a pattern '*requires* at least two acts of racketeering activity,' [section] 1961(5) (emphasis added), not that it 'means' two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: 'The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally re-quires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factory of *continuity plus relationship* which combines to produce a pattern....'

4. In *Barticheck*, the court rejected the proposition that the pattern of racketeering activity necessary for a RICO violation required more than one unlawful scheme or required an "open-ended" scheme.

ceive and distribute bribe money to Nigerian officials, as well as made four bribe payments to that corporation totalling over $1.7 million. Although there were only four or five specific "acts," the Court found a "pattern" of racketeering by focussing on the complexity, nature and scope of the scheme, as well as the large class of Nigerian and American citizen-victims.[5]

Applying the *Barticheck* test (as fleshed out in the Third Circuit cases) to the facts of this case, I conclude that there is no "pattern" of racketeering alleged in Plaintiff's Complaint. First, I view the Complaint as alleging only one "act"—the continued exaggerated assertion of *P.T. Bulletin's* quality and circulation. Judge Pollack's language in *Environmental Tectonics*[6] suggests that the complexity and seriousness of the alleged illegal conduct should influence a court's application and evaluation of the *Barticheck* factors. The alleged scheme is a relatively simple one

and involves conduct much less egregious than the bribery of foreign officials. These reasons, as well as the ease with which one or a few exaggerated statements might come to be considered hundreds of "acts" when repeated in a printed medium, convinces me that the Complaint alleges one single "act."

The second factor—the length of time over which the acts were committed—and third factor—the similarity of the acts—become irrelevant if the exaggerated assertions are considered one continuous "act." Therefore, the fact that the statements were almost identical in nature and made over a three year period does not suggest that a "pattern" of racketeering existed. This conclusion is supported by factor number four—the fact that there were only two alleged perpetrators: A.P.T.A. and George Ludlow.

Furthermore, Plaintiff is the only "victim" *directly* injured by the alleged misconduct.[7] Finally, the character of the unlaw-

5. Judge Pollack (sitting by designation) explained:

> The predicate acts alleged in the amended complaint—mail and wire fraud, bribery, and violations of the Foreign Corrupt Practices Act—were all committed in connection with (or, to facilitate) the payments by Kirkpatrick to the Panamanian corporations. *One could view these payments as a single illegal payment separated into installments, and thus as a one-time affair, rather than as 'criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time.' Marshall–Silver ... But, to focus only on the series of payments—i.e., one bribe divided into four parts— is to ignore the complexity of Kirkpatrick's scheme.* If the appellant's allegations are true, a European conglomerate, and two American corporations—successfully, and over a two-year period—organized to influence a foreign country's award of a procurement contract by illegal means. To facilitate their scheme, they hired a consultant who had contacts with Nigerian officials who were amenable to such an arrangement. This consultant also developed a sophisticated and outwardly legal front for the payments, thereby increasing the difficulty already inherent in detecting such a scheme. The wire and mail communications used to implement this undertaking account for numerous violations of federal law.
> The nature of the acts alleged and the number of victims are also important considera-

tions in this analysis. *See Barticheck ...* ETC claims to have suffered direct economic injury from the appellees' scheme. By illegally influencing the decisions of appellees' public officials, however, appellees have also created an even larger class of victims, the citizens of Nigeria. *Cf. Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir.1987) (two separate schemes to bribe local government officials made victims of the 'taxpayers and residents of the Town of Kearny'). Moreover, because bribery of foreign of foreign officials by American businessmen diminishes this nation's stature and influence abroad, conduct of the kind here alleged victimizes the citizens of this nation as well.
> Our assessment of the amended complaint in light of *Barticheck's* specific factors persuades us that ETC has alleged a 'pattern of racketeering activity' within the meaning of the statute.

*Id.* at 1063–64. (Emphasis added).

6. "One could view these [bribe] payments as a single illegal payment separated into installments ... [but this would] ignore the complexity of [the] scheme." 847 F.2d at 1063.

7. Plaintiffs argue that the victims of this scheme are potentially large in number: "The victims in the present case are both the plaintiff and the large class of physical therapy job advertisers and job seekers." Brief in Opposition to Motion to Dismiss at 7. Judge Pollack's suggestion in

ful activity is not egregious and the fraudulent scheme not complex. The activity alleged by Plaintiff was mere "puffing" at best, false advertising at worst; and no great plan was required to print the misstatements. This is clearly not the type of activity that, "because of its organization, duration, and objectives poses ... a threat of a series of injuries over a significant period of time." *Marshall–Silver*, 835 F.2d at 66–67.[8] Indeed, if the facts in the instant case were deemed sufficient to satisfy RICO's "pattern of racketeering" requirement, then every advertiser would be at risk of being hauled into federal court for allegedly making exaggerated claims.

"To survive a Rule 12(b)(6) motion, a civil RICO claim must allege '(1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity.' *Marshall–Silver Constr. Co. v. Mendel*, 835 F.2d 63, 65 (3d Cir.1987) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985))." For the reasons stated above, I conclude that the complaint fails to allege a "pattern" of racketeering. Consequently, COUNT ONE is DISMISSED for Failure to State a Claim.

Count Two: Antitrust Violations

Defendants next move for dismissal of Plaintiff's Antitrust claim. Since the Complaint does not make clear whether Plaintiff alleges violations of section one or section two of the Sherman Act, and since Plaintiff did not clarify its position in its Reply Brief, I will proceed as if Plaintiff has alleged violations of both sections.

■ Section One of the Sherman Act prohibits illegal restraints of trade. That section, however, was enacted for "the protection of *competition*, not *competitors*" as individual businesses. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). As Defendant P.T. Publishers correctly points out:

> The Complaint in this case fails to allege facts that would support the conclusion that defendants' conduct has had a substantially adverse effect upon *competition*, as distinct from an adverse effect upon *Forum* as a *competitor*. Indeed, the reverse is true: As plaintiff describes things, competition appears to have benefited from defendants' alleged conduct. To begin with, according to plaintiff's view of the relevant market, *Forum* occupied the field as a monopolist before defendants decided to begin printing a competition publication (*see* Complaint [paragraphs] 7, 8, 12, 34); defendants' entry into the market thus *created* competition where none had existed.

Motion to Dismiss Complaint at 20.

In *Eastern Publishing and Advertising, Inc. v. Chesapeake Publishing and Advertising, Inc.*, 831 F.2d 488 (4th Cir.1987) the Court of Appeals affirmed the lower court's dismissal of an antitrust claim for failure to allege injury to competition. Plaintiff, a publishing company, sued for copyright infringement and misappropria-

*Environmental Tectonics* that the citizens of Nigeria and the United States were victims of the alleged fraud, *see* n. 5, *supra*, somewhat supports this argument. However, *Barticheck* surely does not direct courts to consider such indirect victims. If it did, any fraudulent scheme would produce millions of victims, since all members of society are "victims" of crime. This approach, however, would make the "victim" factor of *Barticheck* meaningless. Consequently, I conclude that the injury to "jobseekers" and advertisers caused by the alleged exaggerations is too indirect—those parties are not "victims" in the *Barticheck* sense.

**8.** *See also Goldstein v. Schenk, et al.*, No. 86–7396, slip op. (E.D.Pa., May 16, 1988) [1988 WL 48545] in which plaintiff alleged that three defendants "defrauded plaintiff by (1) intentionally wiring the electric service of other tenants in the building into the electric circuits charged to plaintiff; (2) intentionally charging plaintiff rates for electricity in excess of the current rates; (3) intentionally overcharging the plaintiff for insurance costs; and (4) intentionally overcharging plaintiff for real estate taxes." *Id.* Judge Giles found that there was only one victim and one injury. Furthermore, he concluded that "although the activity continued over a period of about six years, the character of the alleged unlawful activity was not the type which, 'because of its organization, duration, and objectives poses ... a threat of a series of injuries over a significant period of time.' *Marshall–Silver*, 835 F.2d at 66–67." *Id.*

tion, as well as for RICO and antitrust violations. The Court stated:

> Eastern's antitrust claim is based upon the defendants' acts of copyright infringement and appropriation of confidential business information. The district court held this was not to be the type of conduct at which the antitrust laws are aimed and we agree. *See Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1283 (7th Cir.1983). Moreover, the antitrust laws are inapposite here because the only damage is to Eastern as a *competitor;* there is no alleged injury to competition in the relevant market. See *Id.*, at 1284–85. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).... The [district] court noted that before the creation of Chesapeake, there was only one market entity, [plaintiff], and that if events transpire as [plaintiff] predicts, there will only be one market entity, [defendant]. Therefore, there was no injury to competition.

*Eastern*, 831 F.2d at 493. Similarly, Plaintiff Forum Publications has not alleged any injury to competition. Indeed, it could not prove such an allegation: one company—defendant—would replace another company—plaintiff—in occupying the market if Plaintiff is driven out of business. Moreover, if Defendants' alleged scheme to monopolize the market is unsuccessful, two competing national newspapers would exist where only one existed before. Thus competition, instead of being reduced, would actually be increased.[9] To the extent Plaintiff's antitrust claim alleges a violation of section one of the Sherman Act, that claim is, therefore, DISMISSED.

■ Section Two of the Sherman Act prohibits (1) monopolization, (2) attempts to monopolize, and (3) conspiracies to monopolize. 3 J. von Kalinowski, *Antitrust Laws and Trade Regulation* [section] 7.01[1]

(1988). Plaintiff has not alleged that Defendants have in fact created a monopoly. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966) ("[t]he offense of monopoly under [section] 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power...."; *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 389, 76 S.Ct. 994, 1003, 100 L.Ed. 1264 (1956) ("[o]ur cases determine that a party has monopoly power if it has ... a power of controlling prices or unreasonably restricting competition").

According to Plaintiff's own witness, as of August 1988, "the circulation of P.T. or the Physical Therapy Forum was in fact at least 8 percent larger than the total circulation of the P.T. Bulletin ..." Preliminary Injunction Hearing Transcript at 10. However, there is a "widely accepted rule of thumb that while a 90 percent market share definitely is enough to constitute monopolization, 'it is doubtful whether 60 or 64 percent would be enough; and certainly 33 percent is not.'" *Domed Stadium Hotel, Inc., v. Holiday Inns, Inc.* 732 F.2d 480, 489 (5th Cir.1984), *quoting United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945), *approved and adopted, American Tobacco Co. v. United States*, 328 U.S. 781, 811–14, 66 S.Ct. 1125, 1139–41, 90 L.Ed. 1575 (1946). Indeed, "absent special circumstances, a defendant must have a market share of at least 50% before he can be guilty of monopolization ..." *Id.*, 732 F.2d at 489. *See also, Slocomb Indus. Inc. v. Chelsea Indus.*, 1984–1 Trade Cas. (CCH) 65, 932 (E.D.Pa. 1984) ("50% share of this market would be insufficient to establish 'monopoly power'"); *Garside v. Everest & Jennings, Int'l*, 586 F.Supp. 389, 394–95 (E.D.Cal. 1984) (58% to 64% insufficient). Based on Plaintiff's own testimony, therefore, I conclude that as a matter of law there has

---

9. *See also, Garsham v. Universal Resources Holding, Inc.*, 824 F.2d 223, 231 (3d Cir.1987) (upholding dismissal of section one claim asserted by oil-and-gas partners who alleged injury to their own business but not to natural gas consumers); *Cemar, Inc. v. Nissan Motor Corp., USA*, 678 F.Supp. 1091, 1098 (D.Del.1988) (granting motion to dismiss: "[Plaintiff] alleges injury only to itself, not to competition.... [T]o succeed, Cemar must allege the actual anticompetitive impact of the alleged conspiracy").

been no monopolization of the national P.T. advertising market.[10]

■ Nor will Plaintiff be permitted to go forward with any *attempted* monopolization claim since it has not alleged that Defendants' activities enjoyed "a dangerous probability of success." *Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pennsylvania,* 745 F.2d 248 (3d Cir.1984). Indeed, it is in Plaintiff's interest to establish just the opposite—namely, that Defendants' publication had a very *low* circulation—in order to prove that *P.T. Bulletin*'s statement claiming "54% greater circulation than any other P.T. publication" was false and fraudulent.

■ Finally, Plaintiff's allegations [11] are insufficient to maintain a monopolization *conspiracy* since they do no more than simply paraphrase the Sherman Act in conclusory language. This Circuit explained in *Black & Yates, Inc. v. Mahogany Ass'n,* 129 F.2d 227 (3d Cir.1941), *cert. denied,* 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942), that under the Antitrust Laws:

> [a] general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action. Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object and accomplishment [footnote omitted].

*Id.,* 129 F.2d at 231.

Although Plaintiff has sufficiently alleged the object of the conspiracy, it has not sufficiently alleged facts "constituting the conspiracy." Therefore, to the extent that Plaintiff alleges a violation of section two of the Sherman Act, the Defendants' Motion for Summary Judgment [12] is GRANTED.

Plaintiff attempts to turn a garden-variety business tort into an Antitrust claim. However, in order to recover under the Antitrust laws, "[plaintiff] must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). This it cannot do.

## Count Three: DISPARAGEMENT

■ Count Three alleges a claim of Disparagement or Injurious Falsehood. Defendants move for dismissal or summary judgment claiming that Plaintiff "has failed to set forth [its] damages with the required particularity." *Testing Systems, Inc. v. Magnaflux Corp.,* 251 F.Supp. 286 (E.D.Pa.1966). In *Testing Systems,* Judge John W. Lord explained that "[t]he necessity of pleading and proving special damages has been an integral part of the action of disparagement of property since it first developed as an extension of slander of title." *Id.,* 251 F.Supp. at 290. Even where the liberal federal rules of pleading apply,

---

**10.** Defendant A.P.T.A. has pointed out that there are many local and regional publications that contain physical therapy job advertising. Motion to Dismiss at 22. Plaintiff argues that Defendant "ignores the claim in this case, an attempt to monopolize a *national* market in a highly mobile age." Reply Brief at 9 n. 1. Because Plaintiff cannot, in my opinion, make out a monopolization claim even assuming that the market is national in scope, it is unnecessary to define the market actually at stake.

**11.** Plaintiff alleges that
—"During the second half of 1985, and into January 1986," Defendants "entered into an agreement to form an enterprise to be known as 'P.T. Bulletin' for the purpose of monopolizing the market for physical therapy job placement advertising, forcing plaintiff out of business, and obtaining for themselves all revenues which could be derived form regional

and national physical therapy job placement advertising." Cplt. paragraph 8.
—Defendants put this "scheme" into effect by incorporating P.T. Publishers, Inc., and publishing false and disparaging statements in *P.T. Bulletin.* Cplt. paragraphs 9–33.
—Consequently, "defendants combined and conspired to engage in an unreasonable restraint on interstate commerce in order to drive plaintiff out of business, and to create a monopoly for national advertising of physical therapy jobs, causing a substantial impact on interstate commerce." Cplt. paragraph 39.

**12.** Because I have examined evidence external to the Complaint in making my determination, I am treating Defendant's Motion for Dismissal of the Complaint as a Motion for Summary Judgment.

'[i]t [is] ... necessary for the plaintiff to allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication. If the plaintiff desire[s] to predicate its right to recover damages upon general loss of custom, it should ... [allege] facts showing an established business, the amount of sales for a substantial period preceding the publication, and amount of sales subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.' *Erick Bowman Remedy Co. v. Jensen Salsbery Laboratories*, 17 F.2d 255, 261, 52 A.L.R. 1187 (8th Cir.1926).

*Testing Systems*, 251 F.Supp. at 291.

Plaintiff argues that "special damages are pleaded in [paragraph] 42," [13] which states: "Defendants' conduct described above has resulted in financial loss to plaintiff in an amount in excess of $75,000." This statement clearly does not satisfy the Pennsylvania rule requiring the pleading of special damages in disparagement actions. The alleged disparagement took place over the period of several years, and I suspect that Plaintiff will not be able to adequately plead special damages since it has not done so already. Nevertheless, I will permit Plaintiff to amend its Complaint within twenty (20) days to adequately plead special damages.

Count Four: INTERFERENCE WITH BUSINESS AND CONTRACTUAL RELATIONS

[F]our elements must appear in a complaint in order for the plaintiff to state a cause of action for intentional interference with prospective contractual relations:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 209, 412 A.2d 466, 471 (1979).

■ Defendants argue that Plaintiff has not—and indeed cannot—properly allege that prospective contractual relationships existed between Forum Publications and third-party advertisers. "Advertisers place ads in publications concerning physical therapy positions as their needs happen to arise from time to time. Plaintiff has not pled that it had any contract binding these advertisers to place such future ads with it." Defendant A.P.T.A's Motion to Dismiss at 29. I am somewhat persuaded by this argument, particularly in light of language found in *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895, 898–99 (1971) [14]:

[A]nything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman. As the Superior Court of New Jersey has put it, '... the rule to be applied ... is that the broker may recover when the jury is satisfied that but for the wrongful acts of the defendant it is *reasonably probable* that the plaintiff would have effected the sale of the property and received a commission.' *Myers v. Arcadio, Inc.*, 73 N.J.Super. 493, 180 A.2d 329, 331 (1962).

*Id.*, 272 A.2d at 898–99.

I am not convinced that Plaintiff has alleged anything more than a "mere hope."

---

**13.** Reply Brief at 9.

**14.** The court in *Glenn* concluded that the complaint "sufficiently aver[ed] that there was a reasonable probability" that a third party would have entered into a contract with plaintiff.

However, the complaint in *Glenn* alleged many more facts than the instant complaint, permitting the court to conclude that there was a "reasonable probability" of a contract. *See Id.* at 897–98.

However, I will permit Plaintiff to amend its complaint in order to allege with sufficient particularity enough facts to demonstrate the existence of a "reasonably probable" contract that ultimately was affected by Defendants' misstatements.[15]

## DEFENDANT LUDLOW'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

■ Finally, Defendant George E. Ludlow seeks dismissal of this action under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. He alleges that his minimal contacts with the state of Pennsylvania do not satisfy the requirements of the Pennsylvania long-arm statute, 42 Pa.Con.Stat. Ann. section 5322(b), providing that "the jurisdiction of the tribunals of this Commonwealth shall extend to all persons ... to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."

Plaintiff alleges that Defendant Ludlow committed certain acts in both his individual capacity as well as in his capacity as publisher of *P.T. Bulletin*. With respect to Ludlow's individual actions taken before the incorporation of P.T. Publishers, Inc.— the publishing company of *P.T. Bulletin* —Defendants fail to allege *any* specific contact with this forum.[16] Plaintiffs do not allege that Defendant Ludlow has ever visited Pennsylvania, either for personal or business reasons; owned any assets in Pennsylvania; signed any contracts in Pennsylvania; operated any business in Pennsylvania; maintained any offices or telephone numbers or post office boxes in Pennsylvania; registered to do business in Pennsylvania; maintained any bank or savings accounts in Pennsylvania; maintained any agents for the service of process in Pennsylvania; or employed any other agents or representatives. In fact, Defendant Ludlow categorically denies having had any of these contacts with the forum during the relevant period. *See* Ludlow affidavit.

The only forum contacts alleged by Plaintiff are indirect in nature, caused by Defendant Ludlow's actions taken in this corporate capacity outside of Pennsylvania. This court recently noted in *Kane Communications, Inc. v. Norman Klombers, et al.*, No. 87–6594, slip op. (E.D.Pa., March 10, 1988) [1988 WL 26462] (1988 U.S.Dist. LEXIS 1985) that such contacts might not be sufficient to support personal jurisdiction if the defendant was protected by the "corporate shield" doctrine. In *Kane*, I explained that a corporate officer could conceivably be subject to suits in many different jurisdictions if he or she were not protected by this court-created doctrine which limits "the extent to which actions performed in the corporate capacity may be used as a predicate for the exercise of juris-

---

**15.** It is unnecessary for me at this time to consider Defendants' other arguments relating to Count Four, particularly Defendant P.T. Publishers constitutional argument.

**16.** The only pre-incorporation conduct alleged in the Complaint is outlined in paragraphs seven through eleven:

7. During the Summer of 1985 defendant APTA, alone or in conjunction with defendant Ludlow, decided that it should obtain for itself the substantial job placement advertising revenues which plaintiff was earning from its weekly publication, Physical Therapy Forum.

8. During the second half of 1985, and into January 1986, defendants APTA and Ludlow, who was then principal of North American Placement Service, a physical therapy recruiting firm, entered into an agreement to form an enterprise to be known as "PT Bulletin" for the purpose of monopolizing the market for physical therapy job placement advertising, forcing plaintiff out of business, and obtaining for themselves all revenues which could be derived from regional and national physical therapy job placement advertising.

9. Defendants APTA and Ludlow began to put that conspiracy and enterprise into effect by causing defendant PTP to be incorporated in January 1986.

10. The enterprise known as PT Bulletin is owned by APTA and published by PTP, with Ludlow acting as publisher. Defendant APTA agreed that it would furnish its name, logo and mailing list to defendant PTP, in exchange for royalty payments.

11. In addition, through the agreement of the defendants, North American Placement Service became dormant and defendant Ludlow began to devote his full time and attention to the enterprise known as PT Bulletin.

diction over the officer or director as an individual." *Kane* at 6.

Although "[t]he decisions in this district regarding the 'corporate shield' doctrine have not been consistent," *Kane* at 4, I concluded in *Kane* that the law in this district was best described by (then) District Judge Scirica in *Rittenhouse & Lee, et al. v. Dollars & Sense, Inc.*, No. 83–5996, slip op. (E.D.Pa., April 15, 1987) [1987 WL 9665] (1987 U.S. Dist. LEXIS 3061), in which he "suggested that it would never be proper to consider an officer's actions performed outside the forum, even where those actions cause injury within the forum. [Citation omitted]." *Kane* at 9.

I reaffirm my opinion in *Kane* and apply its reasoning to this case. Because Plaintiff has not alleged that Defendant Ludlow has committed *any* acts within Pennsylvania, he is protected by the "corporate shield" doctrine.

Plaintiffs, however, claim that "[*Kane*] is not inconsistent with the finding of jurisdiction in the present case which asserts pre-incorporation activities, and the formation of the corporate shield solely for the purpose of carrying out the fraudulent scheme." Plaintiff's Brief in Opposition to Motions to Dismiss at 12. As I have already stated, however, Plaintiff does not allege a single pre-incorporation *Pennsylvania* contact. Even the most egregious out-of-state activities would not support jurisdiction in this court absent adequate minimum contacts with the forum.

Furthermore, there is little merit in Plaintiff's second argument. As I explained in *Kane:*

A motion under Fed.R.Civ.P. 12(b)(2) 'is inherently a matter which requires resolution of factual issues outside the pleadings, i.e., whether in personam jurisdiction actually lies.' *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n. 9 (3d Cir.1984). Therefore, unlike the Rule 12(b)(6) scenario, the court is not required to accept the factual allegations in the complaint as true. *Id.* The plaintiff is required to come forward with competent evidence, through sworn affidavits or otherwise, to establish the jurisdictional facts by a preponderance of the evidence. *Id.; Minigraph, Inc. v. Qualitech Computer Centers, Inc.*, No. 86–5869, slip op. at 5 (E.D.Pa. June 30, 1987) [1987 WL 13345] (1987 U.S.Dist. LEXIS 5981).

*Kane* at 4. The Plaintiff has come forward with no evidence to support the necessary finding that the pre-incorporation activities established adequate contact with this forum. Without such evidence, I am asked to assert jurisdiction over Mr. Ludlow based simply on Plaintiff's allegation that "Defendant APTA and Ludlow began to put [their] conspiracy [to monopolize the market and force Plaintiff out of business] into effect by causing defendant PTP to be incorporated in January 1986." Cplt. paragraph 9. Such an allegation alone cannot confer jurisdiction upon this court.

Finally, Plaintiff claims that the "corporate shield" doctrine is inconsistent with the United States Supreme Court's holding in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In *Calder*, the court held that two Florida residents could be subjected to the jurisdiction of a California court where the defendants' contacts with the forum were limited, but where the defendants had written and edited an allegedly libelous article in their capacity as employees of the National Enquirer that was distributed in California. The Court explained:

The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California [17]. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both

---

**17.** "The article alleged that respondent drank so heavily as to prevent her from fulfilling her professional obligations." *Id.*

of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California. *Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–298, 100 S.Ct. 559 [567–68], 62 L.Ed.2d 490 (1980); Restatement (Second) of Conflict of Laws [section] 37 (1971).

465 U.S. at 788–89, 104 S.Ct. at 1486–87. The Court continued:

> [Petitioners'] intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have potentially devastating impact upon respondent. And they knew that the brunt of the injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must 'reasonably anticipate being hailed into court there' to answer for the truth of the statements made in their article.

*Id.* at 789–90, 104 S.Ct. at 1486–87.

Defendant Ludlow denies that *Calder* applies in the instant case, asserting that

> *Calder* teaches that due process permits the assertion of personal jurisdiction based on an allegedly defamatory article only to the extent that the article is intentionally directed both at the plaintiff *and at the forum* such that the individual defendants could reasonably foresee both the potential harmful effect of their article on the plaintiff *in the forum,* and the possibility of being forced to defend their actions *in that forum.*
>
> The facts of the present case do not meet these requirements. Unlike the

story in *Calder,* which was specifically directed at a California resident whose injury inevitably would occur primarily in California, where she worked and sought employment, the "filler" statements about circulation at issue in this case were not expressly directed towards anyone.

Defendant's Memorandum in Support of Motion to Dismiss for Lack of Personal Jurisdiction at 6 (emphasis in original).

I agree. *Calder* and other cases focus on fairness to the defendant, defined in terms of "minimum contacts" and the "anticipation of being haled into court" [18]. The defendants in *Calder* certainly had more reason than Defendant Ludlow to anticipate being hailed into a foreign court. Exaggerating one's own position in the market is a far cry from falsely accusing a specific individual of having a serious drinking problem. Were it otherwise, Defendant Ludlow could be sued in presumably every state in which his magazine is distributed. Plaintiff has offered no evidence to suggest that the alleged misstatements were, in effect, directed at Plaintiff in the state of Pennsylvania. Consequently, I conclude that *Calder v. Jones* is not at odds with the "corporate shield" doctrine as applied in this case and that this Court lacks personal jurisdiction over Mr. Ludlow. Defendant Ludlow's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED.

An appropriate order follows.

### ORDER

AND NOW, this 27th day of October, 1988, upon consideration of the Motions to Dismiss filed by Defendants P.T. Publishers, Inc., George E. Ludlow, and American

---

18. *See, e.g., International Shoe Company v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 161 A.L.R. 1057 (1945) ("due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' "); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) ("it is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws"); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 287, 100 S.Ct. 559, 562, 62 L.Ed.2d 490 (1980) ("[t]he forseeability that is critical to due process analysis is ... that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there ...").

**248**

Physical Therapy Association, and the Response thereto filed by Plaintiff Forum Publications, Inc, it is hereby ORDERED that:

(1) COUNT ONE of Plaintiff's Complaint is DISMISSED pursuant to Fed.R.Civ.P. 12(b)(6);

(2) COUNT TWO of Plaintiff's Complaint is DISMISSED pursuant to Fed.R. Civ.P. 12(b)(6) to the extent it alleges a violation of section one of the Sherman Act;;

(3) Defendants' Motion for Summary Judgment is GRANTED with respect to COUNT TWO to the extent it alleges a violation of section two of the Sherman Act;

(4) COUNT THREE of Plaintiff's Complaint will be dismissed unless within twenty (20) days Plaintiff files an amended complaint in accordance with the attached memorandum;

(5) COUNT FOUR of Plaintiff's Complaint will be dismissed unless within twenty (20) days Plaintiff files an amended complaint in accordance with the attached memorandum.